Robert F. **LAUFMAN** et al., **Plaintiffs,**

v.

**OAKLEY BLDG. & LOAN CO.,** et al., **Defendants.**

No. C–1–74–153.

United States District Court, S. D. Ohio, W. D.

Feb. 13, 1976.

Donald F. Colegrove, Cincinnati, Ohio, for plaintiff; Robert F. Laufman, Cincinnati, Ohio, Jay · P. Mulkeen, NCDH, Washington, D. C., of counsel.

Matthew G. Ash, Washington, D. C., amicus curiae for Federal Home Loan Bank Bd.

Frank E. Schwelb, Housing Sec., Civ. Rts. Div., Dept. of Justice, Washington, D. C., amicus curiae for United States of America.

Louis A. Ginocchio, Cincinnati, Ohio, for defendants.

## OPINION

DAVID S. PORTER, District Judge:

This Title VII case, involving "redlining," is before us pursuant to defendants' motion for summary judgment (Rule 56 of the Federal Rules of Civil Procedure) on the asserted ground that there is no genuine issue as to any material fact, that no cause of action is stated and that defendants are entitled to judgment in their favor as a matter of law. Defendants' motion for summary judgment is not well-taken and is denied for the reasons set forth in this opinion. We find that plaintiffs have stated a cause of action under both 42 U.S.C. §§ 3604 and 3605. We also find that plaintiffs have stated a cause of action under 42 U.S.C. § 3617 which provides that "it shall be unlawful to . . . interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. . . ." We further find that plaintiffs have stated a cause of action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

### 42 U.S.C. §§ 3604 and 3605

The principal thrust of plaintiffs' argument is that "redlining" is prohibited by Sections 804 and 805 of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3604 and 3605.[1] In pertinent part, these provisions declare:

Section 3604 *Discrimination in the sale or rental of housing* ". . . it shall be unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny,* a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith,* because of race, color, religion, sex, or national origin." (Emphasis added.)

Section 3605 *Discrimination in the financing of housing*

". . . it shall be unlawful for any bank, building and loan association, insurance company or other corporation . . . to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or . . . of the present or prospective owners, lessees, tenants, or occupants *of the dwelling or dwellings in relation to*

1. As amended Pub.L. 93–383, Title VIII, Section 808(b)(1), Aug. 22, 1974, 88 Stat. 729 (adding word "sex").

*which such loan* or other financial assistance *is to be made or given* . . . ." (Emphasis added.)

Plaintiffs contend that "redlining" is prohibited by the plain language of these provisions; if interpretation is necessary, they add, the Court should give great deference to the interpretation given these provisions by the Department of Housing and Urban Development (HUD) and the Federal Home Loan Bank Board (FHLBB) and should give these provisions a generous interpretation to effectuate the Congressional purpose. Defendants agree that these provisions are clear and unambiguous and that their literal language should be given effect, but they read these provisions not to prohibit "redlining". Defendants argue for a narrow reading of the terms of the Fair Housing provisions of the Civil Rights Act of 1968.

Plaintiffs contend that § 3604(a) not only prohibits conduct constituting a refusal to sell or rent, but also conduct that "otherwise make[s] [dwellings] unavailable." The "otherwise make unavailable" language, plaintiffs argue, has been given a broad reading by the courts and applied specifically to a variety of discriminatory conduct having nothing to do with refusals to sell or rent. These situations include rejection by an orphanage of minority orphans, adoption by a municipality of exclusionary ordinances, and racial steering by real estate brokers. *United States v. Hughes Memorial Home*, 396 F.Supp. 544 (W.D.Va. 1975); *United States v. Parma*, P.H.E. O.H.Rptr. para. 13,616 (N.D.Ohio 1973); *Zuch v. Hussey*, 366 F.Supp. 553 (E. D.Mich.1973). Thus, it is argued that § 3604(a) also outlaws "redlining."

Plaintiffs also contend that defendants' conduct is prohibited by § 3605 which deals specifically with "Discrimination in the Financing of Housing." Plaintiffs assert that "redlining" is prohibited by the plain meaning of this section. They urge that a narrower reading of § 3605 would reduce the language "or of the present or prospective owners,

lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan is to be made or given," to surplusage and redundancy. This construction of § 3605 is also urged so as to be consistent with the broad scope of protection which Congress intended in enacting Title VIII and with the liberal construction that the Supreme Court directed the Act be given.

■ Defendants contend that *only* § 3605 is applicable as that provision specifically governs financing in housing. Reliance on § 3604, which principally concerns the sale or rental of housing, they argue, violates the principle that a specific statutory provision controls a general provision. Defendants buttress their position by reference to the title of § 3604, "Discrimination in the sale or rental of housing," as contrasted with the title of § 3605, "Discrimination in the financing of housing." The titles of legislative enactments are, of course, one indication of legislative intent. *First Bank & Trust Co. of Princeton Ky. v. Feuquay*, 405 F.2d 990, 993 (6th Cir. 1969). But examination of § 3604 reveals that it not only deals with discrimination in the sale or rental of housing in the broadest possible manner, but also has explicit application to other situations as well, so that its coverage clearly extends beyond the usual purview of the terms "sale or rental." For example, § 3604(b) prohibits racial discrimination "in the provision of services or facilities" in connection with the sale or rental of a dwelling. This has been held to include municipal services such as sewage treatment. *United Farm. of Fla. H. Proj., Inc. v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974); *Kennedy Park Homes Ass'n v. City of Lackawanna*, D.C., 318 F.Supp. 669, *aff'd*, 2 Cir., 436 F.2d 108, *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). And § 3604(c) prohibits racially discriminatory advertising practices in connection with the sale or rental of housing. This subsection has been interpreted as prohibiting the recorder of deeds in the District of Columbia from accepting for filing

instruments that contain racially restrictive covenants, *Mayers v. Ridley,* 151 U.S.App.D.C. 45, 465 F.2d 630 (1972). In view of the wide applicability of § 3604, defendants' suggestion that § 3604 should be limited to discrimination in the sale or rental of housing in some narrow sense loses much of its force. And in any event, the denial of plaintiffs' loan application in this case in fact occurred in connection with the sale of a dwelling. Thus, reference to the caption is not controlling.

Moreover, § 3605 governs financing arrangements which lie beyond the coverage of § 3604, no matter how broadly § 3604 is read, as well as certain financial arrangements which would appear to come within § 3604's literal terms. In the category of transactions not subject to § 3604 are loans or other financial assistance for the purpose of "improving, repairing, or maintaining a dwelling," which the owner or occupant has previously acquired. Also, it is worth noting, the application of § 3604 is limited by §§ 3603(a) and 3607, whereas § 3605 is not.

■ In view of these considerations, it appears that § 3604 is applicable generally to transactions involving the sale or rental of housing and § 3605 is applicable generally to transactions involving extensions of financial assistance in connection with housing. Transactions involving both the sale or rental of a dwelling *and* real estate loans or other financial assistance in connection with the sale or rental of the dwelling are subject to both provisions. The same conduct may be prohibited by either or both provisions. In other words, we view §§ 3604 and 3605 as being collateral provisions entitled to equal weight.

■ If the plain meaning of § 3604 is observed, it becomes clear that plaintiffs have stated a cause of action under its terms. The cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively "make unavailable or deny" a "dwelling." When such denial occurs as a result of racial considerations, § 3604(a) is transgressed.

### *42 U.S.C. § 3605*

■ Whether or not § 3604(a) is applicable, § 3605 *is* applicable. This section prohibits any building and loan company from denying a loan "because of the race . . . of the present or prospective owners, lessees, tenants or occupants of the dwelling or dwellings in relation to which such loan . . . is to be made or given." Although not altogether unambiguous, we read this as an explicit prohibition of "redlining."

Obviously, the blunderbuss language of § 3605 prohibits the straightforward denial of a loan because of the race of the borrower. We think it also goes beyond this. In reaching this conclusion, we have considered defendants' argument that if this is the result Congress intended, it would not have used such "obscure and cryptic phraseology," but we have concluded that there is no other logical explanation for Congress to have done so. Instead of the admittedly rather vague expression "in relation to which," Congress could easily have said "for which"—if that was what it meant.

We have also considered defendants' contention that the words "or dwellings" were added only to include multiple-dwelling transactions under the coverage of this section. § 3604 and the remainder of § 3605, however, speak in terms of discrimination in connection with the sale, rental or purchase or construction, etc., of a "dwelling" even though discrimination in connection with more than one dwelling (or in connection with a multiple-dwelling structure) is obviously also meant to be prohibited.

Alternatively, the practice of "redlining" would seem to fall under the proscription against denial of loans and financial assistance on the basis of race because of "the purposes of such loan or other financial assistance," where the purpose of the loan was to finance the purchase of a home in an integrated neighborhood.

■ We have also considered defendants' argument that Congress chose to enumerate in § 3605 the practices of the housing credit industry it deemed advisable to prohibit, that Congress did *not* choose to include redlining in its enumeration, and that this failure to explicitly incorporate redlining in its enumeration of prohibited practices is evidence that Congress did not intend to prohibit redlining. Defendants rely on the ancient maxim, "Expressio unius est exclusio alterius" (doc. 34, p. 13). See 1 Sutherland, Statutes & Statutory Construction § 2017 (3d ed. Horack 1943). "This phrase is, of course, a rule of thumb to interpreting legislative intent rather than a principle of law." *Equal Employment Opportunity Commission v. Kimberly-Clark Corporation,* 511 F.2d 1352, 1362 (6th Cir. February 14, 1975). Indeed, the Supreme Court has observed that this is one of those "rules of statutory construction [that have] come down to us from sources that were hostile toward the legislative process itself and thought it generally wise to restrict the operation of an act to its narrowest permissible compass." *S. E. C. v. Joiner Corp.,* 320 U.S. 344, 350–356, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). In modern times, this rule has been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read the text in light of its context, and, so far as the meanings of words fairly permit, will interpret the text so as to carry out in particular cases the generally expressed legislative policy. Id.; *Passenger Corp. v. Passengers Assn.,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

■ Similarly, we have found unpersuasive defendants' argument that plaintiffs "are, in effect, seeking to extend and then enforce a federal penal statute" (doc. 34, ps. 13–16). §§ 3604, 3605 and 3617 of Title 42, the provisions of the Fair Housing Act upon which plaintiffs base their claim, are not penal in fact or in effect. See doc. 35. Indeed, we find this line of argument rather

misleading. Cf. *Texas & Pacific Railway Co. v. Rigsby,* 241 U.S. 33, 39–41, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

On the other hand, we agree with plaintiffs and amici that the Court should consider and should attach some importance to the interpretation given this Act by the Department of Housing and Urban Development (HUD) and the Federal Home Loan Bank Board (FHLBB). Both of these agencies, which share responsibility for administering the Fair Housing Act, have unambiguously interpreted its provisions as applicable to racial redlining. HUD, the agency with primary responsibility for the administration of the Fair Housing Act, in a report on an extensive survey of lending institutions conducted by HUD in cooperation with four financial regulatory agencies, the Department of Justice, the U. S. Commission on Civil Rights, and the Office of Management and Budget, issued on April 25, 1972, stated that "redlining of areas in a community in which minority group families are concentrated and the refusal to make loans in these areas . . . are prohibited by Title VIII [of the Civil Rights Act of 1968]." HUD (Office of Equal Opportunity), Private Lending Institutions Questionnaire, Initial Report on Returns (April 25, 1972). The Supreme Court has, we should add, specifically held that HUD's interpretations of the language of the Fair Housing Act are "entitled to great weight." *Trafficante v. Metropolitan Life Ins.,* 409 U.S. 204, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

The Federal Home Loan Bank Board has issued formal regulations and guidelines similarly interpreting the Act as prohibiting racial redlining. In pertinent part, these provide as follows:

"*12 C.F.R. 528.2(a)* No member institution shall deny a loan or other service rendered by the member institution for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or discriminate in the fixing of the amount, interest rate, duration, application proce-

dures, or other terms or conditions of such loan or other service because of the race, color, religion, sex, or national origin of

\* \* \* \* \* \*

(3) The present or prospective owners, lessees, tenants, or occupant of the dwelling or dwellings in relation to which such loan or other service is to be made or given; or

(4) The present or prospective owners, lessees, tenants, or occupants of other dwellings in the vicinity of the dwelling or dwellings in relation to which such loan or other service is to be made or given."

*"12 C.F.R. 531.8(c)(6) Age, income level, or racial composition of neighborhood.* Refusal to lend in a particular area solely because of the age of the homes or the income level in a neighborhood may be discriminatory in effect since minority group persons are more likely to purchase used housing and to live in low-income neighborhoods. The racial composition of the neighborhood where the loan is to be made is always an improper underwriting consideration."

Additionally, in a formal opinion dated March 21, 1974, the FHLBB's general counsel advised:

". . . the practice of member institutions of refusing to extend credit, and the practice of extending credit on terms that are less favorable than those usually offered, to borrowers whose security property is located within a predetermined geographic area or areas, because of the location of the property, violate section 528.2(d) if such practices have a discriminatory effect against members of racial ethnic or religious groups."

And in a previous formal opinion dated February 7, 1974, relating to appraisal forms, the general counsel stated:

". . . to extend credit on the basis of an appraisal form which calls for information relating to the ethnic composition of a neighborhood violates sec-

tion 528.2(d) of the Board's regulations, and therefore use of such forms * by member institutions must be discontinued . . . . The use of appraisal forms which call for racial information regarding the neighborhood clearly violates the well-established legal prohibition against consideration of racial factors in real estate transaction."

There is no question in this case but that defendant Oakley is subject to the regulations issued by the FHLBB, 12 U.S.C. § 1437, or that the FHLBB generally has the authority to regulate lending institutions such as defendant Oakley under the Federal Home Loan Bank Act of 1932; the Home Owner's Loan Act of 1933; and the National Housing Act of 1934. Furthermore, we find that the regulations and guidelines issued by the FHLBB in this instance were issued in a valid exercise of the FHLBB's authority."

■ As we recently have had occasion to note, see *Board of Ed. Cincinnati v. Department of H. E. W.,* 396 F.Supp. 203, 236 (S.D.Ohio, W.D.1975), this Court is:

". . . mindful of the well established dogma that agency interpretations of this nature are generally entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *United States v. City of Chicago,* 400 U.S. 8, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Co. v. Electricians,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). And, this deference is particularly appropriate where, as here, the administrative practice in question involves a contemporary construction of the statute by the officers charged with the responsibility of setting its machinery in motion and of making its parts work smoothly and efficiently. *Power Reactor Co. v. Electricians, supra; Griggs v. Duke Power Co., supra; United States v. Groupp,* 459 F.2d 178 (1st Cir. 1972). Likewise, some weight

must be given to agency interpretations which Congress has not overturned despite its opportunity to do so is re-enacting and amending the statute. See, e. g., *United States v. Brown,* 290 F.Supp. 542 (D.Del.1968); *Bridgeport Hydraulic Co. v. Kraemer,* 219 F.2d 929 (1st Cir. 1955)." *Op. Cit.*

As defendants observe, Congress amended 42 U.S.C. § 3605 on August 22, 1974 (doc. 34, p. 12), but Congress did not change the language of this provision to make clear that it did not intend to prohibit racial redlining despite the prior agency determinations that this practice was prohibited by the Act. As indicated above, where prior agency interpretations have not been overturned during subsequent congressional reenactment or amendments, these interpretations take on added importance. Accordingly, we have found it appropriate to give great weight to these agency interpretations of the Fair Housing Act.

## LEGISLATIVE HISTORY

In this case, a realistic examination of the concerns that led to the adoption of this legislation proves a better guide to congressional intent than the dusty volumes of Sutherland on Statutory Interpretation. Primary among these concerns were the rioting and civil disturbances that had rocked the central cores of many of the nation's major cities the previous summer. These disturbances had not only focused attention on the discontent of the people trapped in the nation's ghettoes, but had also brought many to the realization that the underlying illness, of which the riots of 1967 were symptomatic, had to be treated if a worse catastrophe was to be forestalled. This, indeed, was the conclusion of the National Advisory Commission on Civil Disorders appointed by President Johnson in July, 1967. Its final report was released in March, 1968, during the debate on the Civil Rights Act, and its findings were a matter of general concern to Congress.

Indeed, the Commission on Civil Disorders had examined and compiled a staggering compendium of the underlying causes of the racial disorders of the summer of 1967. In particular, the Commission's report discussed at length the problems of residential segregation and racial slum formation. (Chapter 6, The Formation of Racial Ghettos). The report noted:

"Thousands of Negro families have attained incomes, living standards, and cultural levels matching or surpassing those of whites who have 'upgraded' themselves from distinctly ethnic neighborhoods. Yet most Negro families have remained within predominantly Negro neighborhoods, primarily because they have been effectively excluded from white residential areas." (244)

After discussing several common discriminatory tactics, the Commission turned to the problem of "white flight" —which it defined as "withdrawal from, or refusal to enter neighborhoods where large numbers of Negroes are moving or already residing." (244) The report singles out as a critical causative factor the "refusal of whites to move into 'changing' areas when vacancies occur there from normal turnover," leaving most vacancies to be filled eventually by blacks. *Id.*

The Commission reported that "two important points to note about this phenomenon" are:

" 'Massive transition' requires no panic or flight by the original white residents of a neighborhood into which Negroes begin moving. All it requires is the failure or refusal of other whites to fill the vacancies resulting from normal turnover.

"Thus, efforts to stop massive transition by persuading present white residents to remain will ultimately fail unless whites outside the neighborhood can be persuaded to move in." (245)

Little imagination is required to understand that the imposition of barriers to occupancy in the form of higher mortgage-interest rates or refusals to make loans in connection with housing in changing neighborhoods works to dis-

courage families, white or black, which could afford to purchase homes in such neighborhoods. The practical effect is to discourage whites—who may freely move elsewhere—from moving into vacancies in "changing" neighborhoods, thereby inducing "massive transition" and, ultimately, "white flight." Thus, according to this view, redlining directly contributes to the decay of our cities.

Of course, the Commission cites other causes of "white flight" as well—especially, the interplay between racial segregation in housing and in schooling. In this connection, the Commission stated that the "vast majority of inner-city schools are rigidly segregated." (426) It is also noted that:

> "Racial isolation in the urban public schools is the result principally of residential segregation and widespread employment of the 'neighborhood school' policy, which transfers segregation from housing to education." (*Id.*)

Thus, the Commission recognized that discrimination in housing is a major contributing factor to racial isolation in urban schools. That this has direct application to Cincinnati cannot be doubted. See, *Deal v. Cincinnati Board of Education*, 369 F.2d 55 (6th Cir. 1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). Significantly, the Commission predicted that many urban school systems, including Cincinnati's, would have black student majorities by 1985. (391, 431) Cincinnati's school district has reached this mark a decade earlier than predicted.

After canvassing various alternatives, the Commission announced that it had "come to the firm opinion that there is no substitute for enactment of a federal fair housing law." (481) Not surprisingly, Senator Edward W. Brooke, a member of the Commission on Civil Disorders, was a major supporter of efforts to incorporate fair housing provisions into the 1968 Civil Rights Act.

Congress responded to the problems dramatized by the disorders of 1967 by passage of the Civil Rights Act of 1968, including—as recommended by the Commission—the strong Fair Housing legislation now before the Court. (Other titles in the Act concerned interference with federally protected activities, interstate transportation or communication to incite a riot, Indian rights, civil obedience and civil disorders. As this indicates, the concerns of Congress were large and somewhat varied and its response equally wide-ranging.)

As indicated, plaintiffs urge that the Fair Housing mandate of this Act be given a liberal interpretation so as to effectuate the purposes of Congress. Defendants argue that its terms should be construed niggardly. The plaintiffs have the more persuasive position and, accordingly, the Court will, if necessary to interpret the language used by Congress, give the provisions of the Act "a generous construction." *Trafficante, supra,* 409 U.S. at 212, 93 S.Ct. 364.

### 42 U.S.C. § 3617

Plaintiffs also assert that defendants' alleged racial redlining violates § 3617 in that it interferes with plaintiffs' exercise of their right to voluntary interracial association, which is protected under *Trafficante.*

Section 3617 reads as follows:

> "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.
> . . . ."

Defendants contend that § 3617 is "triggered only after a finding of discrimination under one of the therein enumerated prior sections" (doc. 34, p. 9). Defendants do not, however, cite any case authority for this surprising proposition, nor do they attempt to distinguish the cases cited by plaintiffs (doc. 27, ps. 18–19) and the United States (doc. 25, ps. 22–23). Rather, defendants rely on

498

"that salutary rule of statutory construction that a statute should receive a reasonable and practical interpretation in accord with common sense" (doc. 34, p. 9). We believe that a reasonable and practical interpretation of § 3617 supports plaintiffs' position, and that defendants' interpretation would render § 3617 a mere redundancy—in violation of another salutary rule of statutory construction that whenever possible, each provision of a legislative enactment is to be interpreted as meaningful and not as surplusage. And in any event, in this case we have already found defendants' alleged conduct to be in violation of § 3604 and § 3605, two of the enumerated sections.

In the present case, plaintiffs allege that they were denied a loan because of the racial composition of the neighborhood in which the home was located. We agree that this alleged conduct "interfere[s] with [the plaintiffs] in the exercise of or on account of [their] having exercised or enjoyed" the right to equal housing opportunity protected by the Fair Housing Act, causing plaintiffs the "loss of important benefits from interracial association." *Trafficante,* supra, 409 U.S. at 210, 93 S.Ct. at 367. We believe that this interpretation is in accord with *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1975); *Smith v. Stechel,* 510 F.2d 1162 (9th Cir. 1975); *United States v. City of Parma,* P.H.E.O.H. Rptr. para. 13,616 at page 14,016 (N. D.Ohio, 1973); *Tokaji v. Toth,* P.H.E. O.H.Rptr. para. 13,679 (N.D.Ohio, 1974).

At oral argument it was mentioned that there was a bill pending in Congress to require banks and savings and loans to disclose the geographical locations of loans or, in other words, to make more visible the practice of redlining. Congress gave final approval on December 18, 1975, to Public Law 94–200, the Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801, *et seq.* This Court, ever mindful of its function to interpret the law and not legislate, has carefully considered this new legislation to ascertain what light, if any, it may shed on our above interpretation of the Fair Housing Act. The new bill requires mortgage lenders in metropolitan areas to disclose the amount of mortgage money they lend within each city tract area used by the Census Bureau for statistical purposes. If census tract disclosure is not feasible, then lenders can disclose their information by postal zip code areas, which are usually larger and less apt to conform to neighborhood boundaries. The theory behind the Act is that many city residents would not deposit their savings in institutions found to practice redlining.

We conclude that this new Act indicates at the least a grave concern with redlining and the legislative debates in both houses prior to its passage indicate a strong disapproval of redlining where it exists. The main purpose of the Home Mortgage Act of 1975 is to make visible where the practice does exist. This purpose is not inconsistent with Congress' having intended to outlaw redlining earlier by passing the Fair Housing Act. Indeed, it will facilitate the remedying of the problem of redlining by having this new disclosure law on the books. Thus, after careful analysis of this new legislation, we find it to be consistent with our foregoing interpretation of the Fair Housing Act, specifically §§ 3604, 3605 and 3617.

TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d

In addition to their claims under the Fair Housing Act, plaintiffs assert a claim for relief under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. This provision reads:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Clearly, defendant Oakley Building and Loan Company is subject to the prohibitions of Title VI, see 42 U.S.C. § 2000d–1. And, it appears that plaintiffs do

have standing under Title VI. See, *Lemon v. Bossier Parish School Board*, 240 F.Supp. 709 (W.D.La.1965); *Marable v. Alabama Mental Health Board*, 297 F.Supp. 291 (M.D.Ala.1969).

Plaintiffs contend:

". . . [T]here is no question under the allegations of the Complaint that race was an element in defendants' denial of plaintiffs' application for the loan. The fact that it was not plaintiffs' own race, but the race of the people who resided in the neighborhood does not exempt defendants from the broad reach of Title VI any more than it exempts them from coverage under Title VIII. See, *Evans v. Lynn*, No. 157 (2d Cir. 1975)." (doc. 27, p. 20).

Defendants dispute this contention most vigorously (see doc. 34, p. 9). Defendants argue:

"42 U.S.C. Sec. 2000(d) prohibits subjecting a 'person' to 'discrimination.' The legislature does not therein define just what it is that constitutes 'discrimination' against a 'person.' To properly interpret 42 U.S.C. Sec. 2000(d)'s application to the instant facts, we must refer to 42 U.S.C. Sec. 3605 wherein the Legislature has specifically spelled out what conduct is to be considered racial discrimination re lending practices." (doc. 34, p. 9).

There are a number of cogent reasons why defendants' argument must fail. First, we have already held that § 3605 of Title VIII of the Civil Rights Act of 1968 does proscribe the conduct complained of by plaintiffs. Secondly, Title VI of the Civil Rights Act of 1964 is entirely distinct legislation from the subsequent Civil Rights Act of 1968, and its provisions are entitled to an independent interpretation, although experience under other acts may be relevant. Thirdly, defendants' emphasis on the prohibition of § 2000d that no "person . . . shall . . . be subjected to discrimination" is misleading inasmuch as it ignores the parallel prohibition of that section that no "person . . . shall

. . . be excluded from participation in [or] be denied the benefits of . . . any program or activity receiving Federal financial assistance." Plaintiffs complain that the conduct of defendants "excluded [plaintiffs] from participation in" and "denied [plaintiffs] the benefits of . . . [a] program or activity receiving Federal financial assistance," namely participation in defendant Oakley Building and Loan's extensions of home mortgage money to qualified persons, and that the conduct of defendants in so doing was impermissibly grounded on considerations of race. Under these provisions, plaintiffs clearly state a cause of action. Indeed, defendants' alleged conduct in this case might also be actionable under the section's prohibition against "discrimination" on the basis of race against any "person" under a covered program or activity, although it is not necessary to this decision for us to so hold. Defendants are correct in their observation that Title VI does not define "discrimination." "Basically, however, discrimination refers to a denial of equal protection." *Board of Ed., Cincinnati v. Department of H. E. W.*, 396 F.Supp. 203, 225 (S.D.Ohio, W.D.1975). Unquestionably, a denial of federal assistance to loan applicants on the basis of the racial composition of the neighborhood would constitute "discrimination." We believe that Congress could and did prohibit private sources from engaging in such discrimination in connection with any federally assisted activity or program under § 2000d–1.

During oral argument on the defendants' motion for summary judgment, defendants' counsel interjected a new issue into the case, namely, whether plaintiffs have a private right of action under these regulations independent of any action under the specific provisions of the Fair Housing Act itself. Plaintiffs and the *amici* in this case quickly seized upon this new issue and counsel for the Federal Home Loan Bank Board (FHLBB) submitted to the Court in a letter dated October 15, 1975 (doc. 39A) authorities for the proposition "a private party may

derive a right of action from the Board's governing statute, to enforce violations of Board regulations." Defendants have filed a reply memo, the essence of which is that, "regardless of whether [FHLBB] regulations may sometimes afford private litigants a cause of action, those here involved do not afford these plaintiffs a cause of action" (doc. 39, p. 3); although defendants also make the rather frivolous argument that, "to predicate a private cause of action upon a regulation applicable only to those savings and loan associations which are members of the FHLBB system would be violative of the Equal Protection Clause of the Fourteenth Amendment to our federal constitution." *Id.* It is not necessary to resolve these issues in view of our determination of this case.

■ Defendants' counsel also presented at oral argument another new issue in connection with the defendants' attack on the FHLBB regulations and guidelines involved in this case, by arguing that these regulations are actually in conflict with Federal Savings and Loan Insurance Corporation (FSLIC) regulations, specifically with FSLIC regulation 12 C.F.R. § 571.1(G). Counsel stated:

". . . [T]his case could be entitled Federal Home Loan Bank vs. Federal Insurance Corporation, because, believe it or not, the Federal Insurance Corporation has Regulation 571.1, Paragraph G, *which states exactly the opposite* of what the Federal Home Loan Bank Regulation 12 531.8 says. What does 571.1 Paragraph G of the Federal Savings and Loan Insurance Corporation—they have regulations, too—

. . . . .

"It says watch out about loaning in neighborhoods where the neighborhood is declining, where the area, the homes are declining. So, it can get, if you're sitting on a board of directors of a building and loan—

. . . . .

"You're caught in the middle." Tr. 16–17 (doc. 40). (Emphasis added.)

Even assuming that counsel's characterization of § 571.1(G) is correct, it is difficult to see how this regulation can be said to advise "exactly the opposite of what the Federal Home Loan Bank Regulation 12 C.F.R. § 531.8 says." For reference, § 531.8(c)(6) reads:

"12 C.F.R. 531.8(c)(6) *Age, income level, or racial composition of neighborhood.* Refusal to lend in a particular area *solely because* of the age of the homes or the income level in a neighborhood may be discriminatory in effect since minority group persons are more likely to purchase used housing and to live in low-income neighborhoods. *The racial composition of the neighborhood where the loan is to be made is always an improper underwriting consideration.*" (Emphasis added.)

This guideline does not suggest that member banks should make loans on "declining" property, or even in "declining" neighborhoods, since that certainly implies more than "solely" because of the age of the homes or the income level in a neighborhood.

Moreover, counsel's characterization of 12 C.F.R. § 571.1(G) is somewhat overstated. This regulation states when and how an appraisal of properties securing bank loans may be conducted. In pertinent part, § 571.1(G) states:

"The Chief Examiner may obtain the services of a professional appraiser to make actual, physical appraisal of specific properties, . . . or to make a preliminary appraisal or survey. The latter procedure is to estimate the highest and best use of the property, to select the approach which, in his opinion, will develop the most rational value indication, to ascertain whether the neighborhood is improving, stabilizing or declining, to determine the condition of the property, etc." [31 F.R. 8004 (June 7, 1966)]

In all fairness, it must be said that this regulation stops considerably short of mandating "exactly the opposite of what the Federal Home Loan Bank Regulation 12 [C.F.R.] 531.8 says."

In this connection, we believe that the remarks made during oral argument by counsel for the Federal Home Loan Bank Board are notable:

"Considering the brief time that's available, I'd like to start by refuting or attempting to refute a couple of points made by counsel for defendants. First, counsel points out that regulations of the Federal Savings and Loan Insurance Corporation discourage savings and loans from making investments or making loans in 'declining neighborhoods,' and he used that term several times. I suggest that that's the gist of what Congress was attempting to make illegal in Title VIII and the gist of what the Bank Board was trying to make illegal in its regulations, was the feeling on the part of a great many lenders that a racially integrated neighborhood per se must be a declining neighborhood and per se must be a bad credit risk. There is nothing in the Board's regulations or in the Board's policies which mandates an association to make a bad loan as long as the criteria they use for making the loan are legitimate business criteria, such as the credit worthiness of the borrower, the marketability, the salability of the security property, including the neighborhood in which it's located which has a bearing on its salability, the diversification of the institution's assets. All these things are legitimate criteria. But the facts have shown over the years, it's been shown time and again that a neighborhood which had changed from white to black or a neighborhood that is racially integrated, particularly an older neighborhood within city limits of an established and older city need not be a declining neighborhood, and that often a contributing factor to the decline is the refusal of lenders to provide credit for the purchase of these homes or for

the rehabilitation of them. So we take issue with the defense, not on whether or not a financial institution is obligated to make loans in a declining neighborhood, but on the judgment that a declining neighborhood necessarily results when a neighborhood becomes racially integrated.

"THE COURT: You take issue with him, that his client is caught in the middle between two sets of regulations?

"MR. SHORE: Oh, I don't think his client's caught in the middle at all, your Honor. The Board has determined in its regulations that the racial composition of a neighborhood is not a legitimate rationale or criteria and neither is it a business-like criteria for the making of a loan. If a neighborhood in fact is declining, if property can't be sold, for whatever reason, regardless of the racial criteria, why, that's a legitimate business judgment. A neighborhood can decline for a number of reasons. The Board is anxious that lenders not use the racial composition of the neighborhood to effect an automatic judgment that it must be declining." Tr. 28–30.

The foregoing statement constitutes, we believe, a completely satisfactory statement of the relevant FHLBB regulations and policies which we also believe are fully supported by the law.

## CONCLUSION

We find that plaintiffs have stated a cause of action under 42 U.S.C. §§ 3604, 3605, and 3617. Additionally we find plaintiffs have stated a cause of action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Therefore, defendants' motion for summary judgment in this case is hereby denied.