Charles E. MACKEY, Appellant,

v.

NATIONWIDE INSURANCE
COMPANIES, Appellee.

No. 82–1912.

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1983.

Decided Jan. 6, 1984.

Rehearing and Rehearing En Banc
Denied March 2, 1984.

John T. Nockleby, Charlotte, N.C. (J. Le-
Vonne Chambers, Jonathan Wallas, Ronald
L. Gibson, Chambers, Ferguson, Watt, Wal-
las, Adkins & Fuller, P.A., Charlotte, N.C.,
on brief), for appellant.

Jeffrey S. Goldman, Chicago, Ill. (Lawrence M. Cohen, Vicki G. Lafer, Fox & Grove, Chartered, Chicago, Ill., on brief), for appellee.

Before WIDENER and ERVIN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

The plaintiff, a former agent of Nationwide's and a black, brought an action alleging that the defendant had discriminated against him on the basis of his race in terminating his contract and in the terms and conditions of his prior employment. He also complained of the defendant's alleged practice of "redlining," defined as the arbitrary refusal to underwrite the risks of persons residing in predominantly black neighborhoods. He alleged that he had suffered economic harm because of his inability to sell or renew policies insuring the houses of black friends and business acquaintances. Mackey asserted that the redlining practices were in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.;* the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981, 1982 and 1985(3); the Fair Housing Act, 42 U.S.C. § 3601, *et seq.;* and the North Carolina Unfair Trade Practices Act, N.C.G.S. § 75–1, *et seq.*

Upon Nationwide's Rule 12(b)(6) motion, the district judge dismissed the complaint insofar as it challenged the alleged redlining practice. In concluding that these allegations did not state claims upon which relief could be granted, the district judge ruled that the McCarran-Ferguson Act, 15 U.S.C.A. § 1011, *et seq.,* shielded the alleged redlining practice from challenges under the Sherman Act, the Fair Housing Act and the Civil Rights Acts. He found no standing to assert any of those claims because the plaintiff was not a member of the class of policy holders or potential insureds who were harmed by the redlining practice. He also ruled that insurance redlining is not prohibited by the Fair Housing Act and that, even if it was, this claim was barred by the applicable statute of limitations. The pendent claim under the North Carolina Unfair Trade Practices Act was dismissed because it was inadequately related to the plaintiff's remaining claims of direct discrimination against himself.

Upon the plaintiff's motion, the district court entered a judgment under Federal Rule of Civil Procedure 54(b), and we permitted an immediate appeal from the dismissal of these claims challenging Nationwide's alleged redlining practice. While we do not adopt all of the reasoning of the district judge, we affirm the dismissal of these claims for, as to each, there is a substantial ground supporting the conclusion that the claim is not one upon which relief can be granted.

## I.

### *The McCarran-Ferguson Act*

The district court correctly held that the McCarran-Ferguson Act precludes the Sherman Act claim, but we do not agree that it forecloses the claims under the Fair Housing Act and the Civil Rights Acts of 1866 and 1871.

The McCarran-Ferguson Act was the congressional response to the decision of the Supreme Court in *United States v. Southeastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Although *Southeastern Underwriters* established that insurance companies transacting business across state lines were subject to federal regulation under the Commerce Clause, the Congress wished to preserve the traditional role of the states in the taxation and regulation of the business of insurance. *See, e.g., Group Life and Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 217–18, 99 S.Ct. 1067, 1076–77, 59 L.Ed.2d 261 (1979). A secondary objective was to give to insurance companies a limited exemption from the antitrust laws. *Id.* at 218, 99 S.Ct. at 1077. The Act specifically provides that the antitrust laws are inapplicable to the activities of insurance companies if the "business of insurance" is regulated by state law, 15 U.S.C.A. § 1012(b), unless boycotting, coercion or intimidation is involved, *id.* § 1013(b).

■ The plaintiff's Sherman Act claim falls squarely within the exemption provided by the McCarran-Ferguson Act. The Sherman Act applies generally to the business of insurance only in those states in which it is not regulated by local law. A body of state law which proscribes unfair insurance practices and provides for administrative supervision and enforcement satisfies the state regulation requirement of the exemption. *Federal Trade Commission v. National Casualty Co.,* 357 U.S. 560, 564, 78 S.Ct. 1260, 1272, 2 L.Ed.2d 1540 (1958).

North Carolina has an insurance commissioner who is responsible for administering an expansive regulatory scheme, *see* N.C. G.S. § 58–1, *et seq.* The business of insurance is regulated by North Carolina law, and the McCarran-Ferguson Act bars the plaintiff's Sherman Act claim.

■ We disagree, however, with the conclusion that the McCarran-Ferguson Act bars the plaintiff's claims under the Fair Housing Act and the Civil Rights Acts.

Unless a federal statute specifically relates to the business of insurance, the McCarran-Ferguson Act provides that "no act of Congress shall be construed to invalidate, impair or supersede any law enacted by any state for the purpose of regulating the business of insurance." 15 U.S.C.A. § 1012(b). We are not pointed to any law enacted by North Carolina which would be "impaired" by application of the Fair Housing Act or the Civil Rights Acts.[1] The presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act and the Civil Rights Acts. In these circumstances, barring these claims is unnecessary to the effectuation of the congressional goals in enacting McCarran-Fer-

guson, insuring that the states retain the power to regulate the business of insurance and providing regulated insurance companies with a limited exemption from the antitrust laws.[2]

## II.

### Standing

#### A.

The district court was correct in concluding that the plaintiff had no standing to attack Nationwide's alleged redlining practice under the Civil Rights Acts, 42 U.S.C.A. § 1981 and § 1982.

A racially discriminatory refusal to insure houses in predominantly black neighborhoods may give a cause of action under those two sections to the homeowners, the direct victims of racial discrimination. The plaintiff does not claim to be such a victim, but alleges only that he lost opportunities to sell property insurance to black friends and acquaintances.

■ Under Article III of the Constitution, a plaintiff has standing if he has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ." *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The plaintiff's alleged loss of commission income probably satisfies the constitutional requirement that a plaintiff have suffered some injury in fact and have a "personal stake" in the outcome of the litigation. This does not end the matter, however, for there are prudential limitations which enter into the equation in solving most problems of standing. Generally, a litigant is not permitted to assert the legal rights of others. The courts should not be called upon

---

1. Nationwide points to N.C.G.S. § 58–131.37 which prohibits insurance companies from adopting unfairly discriminatory rates. If that statute is concerned with racial discrimination in the fixing of rates, it does not affect discriminatory practices in the acceptance of risks.

2. We need not consider whether the McCarran-Ferguson Act should ever preclude application

of federal civil rights statutes to the insurance industry, *see, e.g., Spirt v. Teachers Insurance & Annuity Assoc.,* 691 F.2d 1054 (2d Cir.1982). It suffices here to hold that McCarran-Ferguson is not applicable by its terms, since application of the Civil Rights Acts and the Fair Housing Act will impair no state law.

to decide questions of broad social import in cases in which no individual rights will be vindicated, and access to the federal courts should be limited to those litigants best suited to assert the claims. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979). The persons best suited to challenge the redlining practice are those owners of homes and buildings who have been the direct victims of the alleged discriminatory practice.

■ Mackey appears to concede that the prudential limitations on standing would ordinarily preclude his claims under §§ 1981 and 1982 challenging Nationwide's alleged redlining practice. He contends, however, that he was "punished" for trying to vindicate the §§ 1981 and 1982 rights of the home and building owners, and that the fact of punishment brings him within the exception of *Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

In *Sullivan,* a white man owned two houses in the area served by Little Hunting Park, a community playground operated by a nonstock corporation. He rented one of the houses to Freeman and assigned to him a membership share in the park. The board of the park refused to approve the assignment because Freeman was black. When Sullivan protested the board's action, he was expelled from membership in the park and was tendered cash for his two shares. The Supreme Court held that Sullivan had standing to sue the park because he had been "punished for trying to vindicate the rights of minorities protected by § 1982." The Court was careful to state, however, that Sullivan's standing to sue was based on the fact that he was the "only effective adversary" of the unlawful racial discrimination.

If the Supreme Court had held that Sullivan had no standing to sue, there might have been a breakdown in the machinery for the vindication of important rights. A possibility of expulsion for assigning a membership share to a black would tend to make most white householders fearful of doing so. A potential black purchaser would have a difficult time proving that he had been the victim of discriminatory action by the board. Perhaps, in Little Hunting Park, Sullivan's history might get a black potential purchaser-plaintiff home, but the difficulties in other such communities would be enormous.

These considerations are dramatically illustrated in *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983). Scott, a real estate developer, undertook to construct a low income apartment complex, but his efforts were frustrated by threats of zoning changes stemming from opposition to the coming of black renters into the neighborhood. We held that Scott had standing to sue under § 1983. Had he been denied standing to sue, there was no potential black plaintiff who might have vindicated the § 1983 rights because the apartments had never been constructed or offered for rent.

The situations presented in *Sullivan* and *Scott* are in stark contrast to the present case. There is no impediment to actions by those blacks who were denied property insurance because of the alleged discriminatory practice. Denying standing to Mackey does not insulate Nationwide from legal accountability for any deprivation of § 1981 and § 1982 rights it may have committed.[3]

### B.

■ Mackey does have standing, however, to challenge the alleged redlining practice under the Fair Housing Act. The Supreme Court has said that Congress intended standing under this Act to "extend to the full limits of Article III." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103, n. 9, 99 S.Ct. 1601, 1609, n. 9, 60 L.Ed.2d 66 (1979). The normal prudential barriers to standing may not be set up as obstacles to the maintenance of actions un-

---

3. We find it unnecessary to consider plaintiff's standing to sue under § 1985(3) because he has failed to allege a "conspiracy." *See Rice v. President and Fellows of Harvard College,* 663 F.2d 336, 338 (1st Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).

der the Fair Housing Act. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1983). The plaintiff has alleged an economic injury to himself, satisfying the Article III requirement, and that is all that need be shown.

### III.

#### The Fair Housing Act

Plaintiff challenges Nationwide's alleged redlining practice under §§ 804 and 817 of the Fair Housing Act. 42 U.S.C.A. §§ 3604, 3617.

■ We find that § 804 does not proscribe the alleged hazard insurance redlining practice.[4] Section 804 makes it unlawful "to refuse to negotiate the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race ...." Section 804(b) makes it unlawful "to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race ...."

Section 805, 42 U.S.C.A. § 3605, makes it unlawful for any commercial real estate lender to deny a loan or other financial assistance to a person applying therefor for the purpose of acquiring, improving or maintaining a dwelling on account of the person's race.

Mackey contends that mortgage financing cannot be acquired without adequate hazard insurance and that financial assistance is necessary for most people to secure adequate housing. This leads him to the conclusion that the refusal to insure a dwelling makes it "unavailable" within the meaning of § 804(a). He also contends that insurance is a "service" in connection with the purchase of a dwelling within the meaning of § 804(b).

While the statute in § 805 specifically prohibits discrimination in providing financial assistance, there is no mention in the Fair Housing Act of insurance. The legislative history contains no discussion of a barrier to fair housing created by the insurance industry. Senator Mondale, who introduced the original bill, stated that it was necessary to eliminate discriminatory practices of property owners, real estate brokers, builders and home financers. Cong. Rec.S. 2272–2284 (daily ed. Feb. 6, 1968).

If § 804 was designed to reach every discriminatory act that might conceivably affect the availability of housing, § 805's specific prohibition of discrimination in the provision of financing would have been superfluous.

Moreover, there are different considerations that may have influenced Congress in shaping federal proscriptions of discrimination in financing and in insurance. The insurance industry has traditionally classified risks. If insurance premiums are to remain at reasonable levels for most householders, some insurers must be permitted to reject risks which are perceived to be excessively high, while charging higher premiums on some risks than upon others. It is not suggested that financial institutions do not have greater risks in making mortgage loans in neighborhoods that are deteriorating than in other areas, but the fact that Congress chose to proscribe discrimination in mortgage financing does not suggest that it would have come to a similar conclusion with respect to hazard insurance. The fact that hazard insurance was not mentioned in the statute or its legislative history strongly indicates that it would not. Moreover, it has been the insistent position of the Congress that regulation of the insurance industry be left to the states.

---

**4.** The district court held that Mackey's claim under § 804 was barred because the action was filed more than 180 days after termination of his agency contract. Aside from the possibility that the defect might be cured by amendment, the claim under 817 requires a decision as to the applicability of § 804. Section 817 makes it unlawful to "interfere with any person ... on account of his having aided or encouraged any

other person in the exercise or enjoyment of any right granted or protected by § ... 804 ...." Mackey alleges that he aided and encouraged others within the meaning of § 817 and suffered a termination of his contract as a consequence. Hence, by indirection, he has properly raised the issue of the application of § 804.

The Congress which enacted the Fair Housing Act in 1968 was not unaware of the problem of the unavailability of hazard insurance in some urban areas. In that same year, it enacted the Urban Property Protection and Reinsurance Act of 1968. *See, particularly* 12 U.S.C.A. § 1749bbb, *et seq.* Its approach was very different. For losses caused by riots or civil disorders, it provided federal reinsurance for participating insurers and sought to achieve the participation of insurers under state enacted FAIR plans.

Since the enactment of the Fair Housing Act in 1968, attempts have been made to amend it so as to extend its coverage to discrimination in the provision of insurance on dwellings. Those attempts have not been successful. Section 6(c) of the Fair Housing Amendments Act of 1980 would have amended § 804 by inserting a specific reference to insurance. In Report No. 96–865 of the Committee on the Judiciary of the House, it was stated on page 12 that the purpose of the amendment was to prohibit "any form of adverse disparate treatment that impacts disproportionately on protected persons and which is not justified by sound business necessity." It was said that the amendment was a clarifying one, intended as a codification of existing case law, citing *Dunn v. Midwestern Indemnity,* 472 F.Supp. 1106 (S.D.Ohio 1979).

Although the proposed amendment was said to have been a clarifying one, there certainly was no consensus that the intention of Congress in 1968 was to proscribe discrimination in providing hazard insurance. In a statement of the supplemental views attached to the House Report, Congressman Butler emphatically stated that that was not the intention. *See,* page 60, *et seq.,* at 62. Both he and Representative McClory, page 54, *et seq.,* expressed opposition to the amendments that would bring in insurance, and questioned the authority of *Dunn v. Midwestern Indemnity.*

Indeed, the amendments that would have brought in the insurance industry failed to pass.

Insofar as it was said that the proposed amendments were intended to codify existing law, *Dunn* is hardly an authoritative declaration of the law for the entire country. The district judge in *Dunn* heavily relied upon *Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489 (S.D.Ohio 1976). In *Laufman,* it was held that discrimination in the financing of housing was within the broad proscription of § 804. That holding was clearly unnecessary to the court's decision, for the discrimination in financing was clearly within the explicit prohibition of § 805. The conclusion in *Laufman* that discrimination in financing is impliedly prohibited by § 804 lends little support to *Dunn's* holding that discrimination in the provision of insurance is also impliedly included.

Bills to amend the Act so as to prohibit discriminatory practices in the hazard insurance industry were introduced in the House in 1978, 1979 and 1980.[5] No such amendment has been adopted. Since there is no reference to hazard insurance in the 1968 statute or in its legislative history, the failure of the proposed amendments is supportive of our conclusion that the statute as enacted in 1968 was not intended to reach the hazard insurance industry.

Section 804(b) prohibits discrimination against any person in the provision of services or facilities in connection with a dwelling. Mackey contends that hazard insurance is a service in connection with a dwelling, but surely that is a strained interpretation of the word. It encompasses such things as garbage collection and other services of the kind usually provided by municipalities. The hazard insurance industry is in the business of providing hazard insurance for householders, but what the industry does cannot reasonably be described as the provision of a service in connection with dwellings.

---

5. H.R. 3504, 95th Cong., 2d Sess. (1978); H.R. 2540, 96th Cong., 1st Sess. (1979); H.R. 5200, 96th Cong., 2d Sess. (1980).

For these reasons, we conclude that Mackey's claims are not within the Fair Housing Act.

## IV.

### Pendent Claim Under the North Carolina Unfair Trade Practices Act

Since all of the federal claims attacking the alleged redlining practice were properly dismissed, dismissal of the pendent state claim attacking the same alleged practice was proper.

## V.

Mackey's claims of direct discrimination against himself were left intact by the district judge, and they remain viable. For the reasons stated, however, we affirm the dismissal of all of the claims directed to the alleged redlining practice.

AFFIRMED.

ERVIN, Circuit Judge, concurring and dissenting:

I concur in parts I, IIB, III, and IV of the majority opinion. I cannot agree, however, that the plaintiff lacks standing to attack Nationwide's alleged redlining practice under the Civil Rights Act, 42 U.S.C. sections 1981, 1982 and 1985. The majority concedes that Mackey's alleged loss of income "probably satisfies" the constitutional requirement of injury in fact, but concludes that because Mackey has brought suit on behalf of others standing should be denied. In my view, the majority has misread Mackey's complaint and misconstrued the proper relationship between the two prongs of the standing test discussed in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). For this reason, I respectfully dissent from part IIA of the court's opinion.

## I.

In *Warth* the Supreme Court set forth a two part test to determine whether a party has standing to sue. As a threshold matter, Article III of the Constitution requires the plaintiff in every federal case to allege " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99, 95 S.Ct. at 2204–05, quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The injury claimed must be "distinct and palpable", 422 U.S. at 501, 95 S.Ct. at 2206, and "fairly traceable" to the defendant's actions. *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977), quoted in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 376, 102 S.Ct. 1114, 1123, 71 L.Ed.2d 214 (1983). The injury, however, need not be direct. *United States v. SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

In addition to this minimum requirement, certain "prudential" considerations must be satisfied. The plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." 422 U.S. at 499, 95 S.Ct. at 2205. It is not enough for the plaintiff to allege a " 'generalized grievance' shared in substantially equal measure by . . . a large class of citizens. . . ." *Id.* at 499, 95 S.Ct. at 2205. The rationale behind these prudential limitations is to ensure that courts are not called upon to decide "abstract questions of wide public significance" where "judicial intervention may be unnecessary to protect individual rights," *Id.* at 500, 95 S.Ct. at 2206, and to guarantee that "the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Env. Study Group,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978).

The Supreme Court has made clear, however, that prudential concerns should not be used to deny standing to a plaintiff who alleges a particularized claim on his own behalf simply because his complaint merely mentions or implicates the rights of others. In *Duke Power,* for example, a private environmental group challenged the constitutionality of the Price-Anderson Act on the grounds that the Act's limitation on liability for nuclear accidents violated the due proc-

ess clause and "equal protection component" of the fifth amendment. 438 U.S. at 68, 98 S.Ct. at 2627. The Court held that the plaintiff had standing to sue, even though the claim clearly implicated the rights of third parties residing in the vicinity of defendant Duke Power Company's reactors, and even though the relief requested was clearly designed to benefit a general populace. While recognizing that there were "good and sufficient reasons" for invoking prudential limitations when the rights of third parties are implicated, the Court concluded that:

> Where a party champions his own rights and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.

*Id.* at 80–81, 98 S.Ct. at 2634–2635; *see also Arlington Heights v. Metropolitan Housing Corporation,* 429 U.S. 252, 263–69, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1977) (individual plaintiff permitted to bring suit alleging particularized harm despite fact that additional claim was brought on behalf of third parties).

The facts of *Warth* underscore the relatively narrow range and type of claim that prudential considerations were designed to preclude. In *Warth,* eight individuals and several citizens' associations challenged the constitutionality of an exclusionary zoning ordinance in Penfield, New York. One of the plaintiff groups—Metro-Act—alleged that 9% of its membership resided in Penfield and had been indirectly harmed by exclusion of low and moderate income families. The Supreme Court concluded that Metro-Act did not have standing because the organization, as the representative of its members, had not alleged a sufficiently palpable injury to satisfy Article III and because "prudential considerations strongly counsel[ed] against ... allowing Metro-Act to invoke the judicial process." 422 U.S. at 514, 95 S.Ct. at 2213. Central to the Court's holding was the fact that none of the Penfield residents had themselves alleged a

deprivation of constitutional rights under 42 U.S.C. sections 1981, 1982 or 1985. *Id.* at 514–15, n. 22, 95 S.Ct. at 2213, n. 22. In short, Metro-Act had raised "putative rights of third parties", *id.* at 514, 95 S.Ct. at 2213, in an effort to have the judiciary decide a question of "broad social import where no individual rights would be vindicated." *Gladstone Realtors v. Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

## II.

Unlike Metro-Act, the harm alleged by Mackey does not hinge on the rights of third parties. Mackey's claim is not primarily a generalized grievance made on behalf of a class of speculative third parties who have been denied property insurance because of alleged redlining practices; rather, Mackey essentially is championing his own rights as an insurance agent whose business practice has been harmed by the defendant's practices. Mackey alleges first and foremost that Nationwide's practice of "arbitrarily and discriminatorily denying insurance coverage to policyholders in black neighborhoods that [he] ... would present to the company for coverage" has forced him to suffer substantial economic loss. Specifically, Mackey asserts that by refusing to allow him to enter into insurance contracts with potential customers, Nationwide has directly violated contract and property rights secured to him under 42 U.S.C. sections 1981, 1982 and 1985, and has denied him the same terms and conditions of employment granted white insurance agents of the Company. This discriminatory practice, Mackey argues, resulted in the wrongful termination of his agency contract and consequently caused substantial economic loss to him. Thus, in contrast to *Warth,* the harm claimed by Mackey is at once particularized, direct, "peculiar" to his position as an insurance agent, and involves a violation of his individual constitutional rights.

Construing the complaint in "favor of the complaining party" and "accept[ing] as true all material allegations of the complaint,"

 

*Warth v. Seldin,* 422 U.S. 501, 95 S.Ct. at 2206, I cannot say that Mackey has not alleged *direct* and concrete harm to his insurance practice. There is every reason to believe that the harm will be redressed, and future harm prevented, by the relief requested. 438 U.S. at 80–81, 98 S.Ct. at 2634–35. In short, the proper question to ask is not, as the majority phrases it, whether other potential black plaintiffs can be found to challenge Nationwide's discriminatory practices, but whether Mackey is an appropriate party to assert an individual claim of injury to his insurance practice. I see no reason why Mackey is not well suited to bring such a claim.

In theory, a plaintiff might be found to have satisfied the Article III requirement, and yet still be denied standing because the *essential* nature of his claim—although alleging some indirect individual harm— was primarily a generalized one brought on behalf of third parties who had not shown harm. Such was the case in *Warth.* Yet the mere fact that questions of "broad social import" are implicated does not mean that prudential considerations will automatically preclude standing where constitutional requirements are met. If broad social questions are incidental to the essentially *individual* nature of the claim being made, prudential considerations are inapplicable. Such was the case in *Duke Power,* and in my view, such is the case here.

In his complaint Mackey mentions that Nationwide's practices have injured other blacks as well as himself. Indeed, in part IV of the complaint Mackey specifically notes that Nationwide's actions have "violated rights secured to plaintiff and other citizens" under 42 U.S.C. sections 1982 and 1985. These references to third parties, however, do not alter the essentially individual nature of the harm alleged. The primary purpose of Mackey's suit is to win relief for injuries he has suffered in violation of section 1981, 1982 and 1985.[1] To fit Mackey's complaint within the framework of *Warth* requires either a misreading of the essence of the claim or a misinterpreta-

tion of the meaning of "prudential limitations." This I decline to do.

### III.
Because Mackey is asserting his own rights and has alleged a concrete and particularized injury that will be redressed by the relief requested, I would remand this action to the district court with orders to proceed on the sections 1981, 1982 and 1985 redlining claims.

---

1. Mackey's section 1981 claim makes no reference to third parties.