**NATIONWIDE MUTUAL INSURANCE COMPANY** and Nationwide Mutual Fire Insurance Company, Plaintiffs–Appellants,

v.

Henry CISNEROS, Secretary of the United States Department of Housing & Urban Development; Jerald L. Steed, Executive Director, Dayton Human Relations Council; Charles W. Brown, Chairperson, Dayton Human Relations Council; and City of Dayton, Defendants–Appellees.

No. 94–3296.

United States Court of Appeals, Sixth Circuit.

Argued March 30, 1995.

Decided May 1, 1995.

Lawrence M. Cohen (argued), Jeffrey S. Goldman, Joel W. Rice (briefed), Fox & Grove, Chartered, Chicago, IL, for plaintiffs-appellants.

Jessica D. Silver, Linda F. Thome (argued and briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, for Henry Cisneros.

Kenneth Eugene Barden (argued and briefed), Office of the City Atty., Dayton, OH, for Jerald L. Steed, Charles W. Brown, and City of Dayton.

Before: KENNEDY and MILBURN, Circuit Judges; WISEMAN,* District Judge.

MILBURN, J., delivered the opinion of the court, in which WISEMAN, D.J., joined. KENNEDY, J. (p. 1364), delivered a separate dissenting opinion.

MILBURN, Circuit Judge.

Plaintiffs Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company appeal the district court's grant of summary judgment to defendants Henry Cisneros, Secretary of the United States Department of Housing and Urban Development; Jerald L. Steed and Charles W. Brown, Executive Director and Chairperson, respectively, of the Dayton, Ohio Human Relations Council; and the City of Dayton, Ohio, in this action for declaratory judgment and injunctive relief in which plaintiffs challenged defendants' authority to regulate the issuance and cancellation of homeowner's insurance policies under the Fair Housing Act.

---

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

On appeal, the issues are (1) whether the district court erred in finding that the Fair Housing Act governs the business of property insurance, (2) whether the district court erred in finding that the McCarran–Ferguson Act does not preempt the regulation of the business of insurance under the Fair Housing Act, and (3) whether the district court erred in dismissing plaintiffs' state law claims. For the reasons that follow, we affirm.

## I.

### A.

Plaintiffs Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company (collectively "Nationwide"), Ohio corporations, seek declaratory and injunctive relief from attempts by the Department of Housing and Urban Development ("HUD") to regulate plaintiffs' property insurance underwriting practices under the Fair Housing Act ("the Act"), 42 U.S.C. § 3601, *et seq.* The insurance underwriting practices in question involve "redlining," in which the insurer charges higher rates or declines to write insurance for people who live in particular areas. Defendant HUD is responsible for the administration of the Fair Housing Act. Plaintiffs also seek declaratory and injunctive relief from attempts by defendants Jerald L. Steed, Charles Brown, and the City of Dayton ("the Dayton defendants") to regulate plaintiffs' property insurance underwriting practices under Ohio state law and Dayton municipal law. As earlier stated, Jerald L. Steed and Charles Brown are the Executive Director and the Chairperson, respectively, of the Dayton Human Relations Council ("DHRC"). In addition to enforcing fair housing provisions of Dayton ordinances, DHRC also assists HUD in the local administration of housing discrimination complaints under the Fair Housing Act.

Under the Fair Housing Act, HUD is responsible for receiving and investigating charges of discrimination in housing. Because mortgage lenders require borrowers to obtain and maintain property and hazard insurance on mortgaged property as a condition of obtaining a loan, HUD has interpreted the Fair Housing Act as prohibiting discriminatory practices relating to property and hazard insurance. HUD has adhered to this interpretation of the Act since at least 1978, when HUD's General Counsel wrote in a memorandum to the Assistant Secretary for Equal Opportunity:

> Adequate insurance coverage is often a prerequisite to obtaining financing. Insurance redlining, by denying or impeding coverage makes mortgage money unavailable, rendering dwellings "unavailable" as effectively as the denial of financial assistance on other grounds[.]

Memorandum to the Assistant Secretary for Equal Opportunity, dated August 25, 1978 (quoted in defendant HUD's brief at 10). Furthermore, in 1988, the Fair Housing Act was amended to authorize HUD to issue rules to implement the Act. 42 U.S.C. § 3614a. At that time, HUD issued a regulation reflecting its interpretation of the Act and its application to insurance companies. This regulation defined "other prohibited sale and rental conduct" to include:

> Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.70(d)(4).

In May 1990, HUD received a complaint from Steven and Jennifer Beavers alleging that Nationwide had cancelled their homeowner's insurance because of their race and/or place of residence. HUD referred this complaint to the DHRC, which determined that it was "probable" that Nationwide had violated the City of Dayton's fair housing ordinances. In addition, on September 28, 1990, Sarah Wilson filed a housing discrimination complaint with HUD, alleging that Nationwide had refused, because of her sex, race, and the racial make-up of the area, to reinstate her insurance policy on a residential building that was located in a predominantly black area of Toledo, Ohio. HUD and the DHRC were in the process of investigating these complaints when Nationwide filed this action. Both investigations have been

held in abeyance pending the conclusion of this case.

### B.

Plaintiffs commenced this action for declaratory and injunctive relief on May 6, 1991, in the United States District Court for the District of Columbia. Plaintiffs named as defendants Jack Kemp, then Secretary of HUD; Jerald L. Steed and the Reverend Charles Brown, the Executive Director and Chairperson, respectively, of the Dayton Human Relations Committee; and the City of Dayton, Ohio. The Dayton defendants moved for a change of venue, and on December 13, 1991, pursuant to 28 U.S.C. 1404(a), the action was transferred to the United States District Court for the Southern District of Ohio.

In May 1992, defendants moved to dismiss plaintiffs' complaint on jurisdictional grounds. Thereafter, on December 1, 1992, plaintiffs moved for summary judgment. The Dayton defendants and HUD filed cross-motions for summary judgment on January 14 and 15, 1993, respectively. On September 27, 1993, the magistrate judge issued his Report and Recommendation in which he concluded that the issues presented in the case were ripe for review and thus recommended that the district court deny HUD's motion to dismiss. In addition, the magistrate judge recommended that the district court grant defendants' cross-motions for summary judgment and deny plaintiffs' motion for summary judgment upon concluding (1) that HUD's interpretation of the Fair Housing Act was entitled to judicial deference; (2) that, in any event, it was a correct interpretation of the Fair Housing Act; and (3) that the regulation was not barred by the McCarran–Ferguson Act. Finally, the magistrate judge granted HUD's motion for a protective order barring certain discovery and recommended that the district court decline to exercise jurisdiction over plaintiffs' state law claims.

Plaintiffs filed timely objections to the magistrate judge's report and recommendation. On February 24, 1994, the district court adopted the magistrate judge's report and recommendation and dismissed this action. This timely appeal followed.

### II.

### A.

 Plaintiffs argue that the district court erred in granting defendants' cross-motions for summary judgment and denying their motion for summary judgment.[1] We review a district court's grant of a motion for summary judgment de novo. *Michigan Protection & Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994). "This court will affirm the district court's order only if we determine that the pleadings, affidavits, and other submissions show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Babin,* 18 F.3d at 341 (quoting Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(c)). All evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Babin,* 18 F.3d at 341 (quoting *Celotex Corp v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

Plaintiffs argue that the district court erred in finding that defendants have delegated authority, under the Fair Housing Act, or under "substantially equivalent" local ordinances, to regulate plaintiffs' property insurance underwriting practices. Specifically, plaintiffs assert that the plain language, structure, and legislative history of § 3604(a) and (b) of the Fair Housing Act preclude this

---

1. Plaintiffs also argue in a footnote in their brief that the magistrate judge abused his discretion in granting HUD's motion for a protective order. However, plaintiffs failed to object to this ruling before the district court and thus have not preserved this issue for appeal. *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981).

finding. Section 3604(a) and (b) of the Fair Housing Act state that it shall be unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny,* a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or *in the provision of services* or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a) and (b) (emphasis added). HUD has interpreted these provisions of the Fair Housing Act to prohibit "[r]efusing to provide ... property or hazard insurance for dwellings or providing such ... insurance differently because of race ..." 24 C.F.R. § 100.70(d)(4). Plaintiffs argue that HUD, in promulgating this regulation, has exceeded the authority delegated to it by Congress under the Fair Housing Act, and therefore the Dayton defendants lack the authority to investigate claims of discriminatory insurance underwriting practices. The district court rejected plaintiffs' argument and adopted the reasoning of the magistrate judge in his report and recommendation, which concluded that HUD had "not exceeded its statutory authority in enacting its regulations because the interpretation of the Fair Housing Act embodied in that regulation is one to which judicial deference is to be accorded under [*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)]. Furthermore, even in the absence of *Chevron* deference, HUD's interpretation of the Fair Housing Act is correct." J.A. 178.

■ We are confronted with two questions when we review an agency's construction of a statute. In *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339 (6th Cir.1994), we stated:

First and foremost is the question whether Congress has directly spoken to the matter at hand. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842 (1984). "If the intent of Congress

is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, the court decides that Congress has not directly addressed the precise question at issue, the court may not simply impose its own construction of the statute. *Id.* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

*Lansing Dairy,* 39 F.3d at 1349–50 (parallel citations omitted). In *Chevron,* the Court also stated that in determining whether an agency's answer is based on a permissible construction of a statute, a reviewing "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. However, the Court also noted that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. Thus, we must first determine whether the text of the Fair Housing Act addresses the precise issue in this case, i.e., whether § 3604(a) and/or (b) govern the issuance and cancellation of property insurance policies.

In *N.A.A.C.P. v. American Family Mut. Ins. Co.,* 978 F.2d 287 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993), the Seventh Circuit held that Congressional intent regarding the application of § 3604 of the Fair Housing Act to insurance practices is unclear:

The Fair Housing Act does not define key terms such as "service" and "make unavailable". [sic] By writing its statute in the passive voice—banning an outcome while not saying *who* the actor is, or *how* such actors bring about the forbidden consequence—Congress created ambiguity.

*American Family,* 978 F.2d at 298 (emphasis in original).

■ On the other hand, plaintiffs argue that the plain language and structure of § 3604(a) preclude its application to insurance providers. Specifically, plaintiffs rely on the canons of statutory interpretation of "ejusdem generis" and "expressio unius est exclusio alterius" in support of their contention that insurance underwriting practices are not governed by the Fair Housing Act. First, plaintiffs argue that HUD's interpretation of § 3604 conflicts with the principle of "ejusdem generis," which states that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *See Otis Elevator Co. v. Secretary of Labor,* 921 F.2d 1285, 1289 (D.C.Cir.1990). Thus, plaintiffs argue that in § 3604(a), because the general phrase "otherwise make unavailable or deny" follows the specific examples of failure "to sell or rent" or refusal "to negotiate for the sale or rental" of a dwelling, the phrase "otherwise make unavailable or deny" does not include any activities that do not directly affect the availability of a dwelling. We disagree. Plaintiffs' argument that the phrase "otherwise make unavailable or deny" must only include activities that directly affect the availability of a dwelling does not clarify Congressional intent as to whether the availability of property insurance falls within this category. Therefore, we conclude that the canon of "ejusdem generis" does not preclude HUD's interpretation of § 3604(a).

■ Second, plaintiffs argue that the maxim "expressio unius est exclusio alterius," which states that the mention of one thing implies exclusion of another, also precludes HUD's interpretation of § 3604. Specifically, plaintiffs note that § 3604(b) proscribes discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," and that § 3605 bars discrimination in mortgage financing. Therefore, plaintiffs assert that the fact that the statute proscribes some conduct that indirectly affects housing, i.e., services and mortgage financing, suggests that property insurance is not covered by the Act. Relying on the Fourth Circuit's decision in *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419 (4th Cir. 1984), plaintiffs argue that this result is necessary to avoid rendering §§ 3604(b) and 3605 of the Act superfluous. In *Mackey,* the Fourth Circuit concluded § 3605 shows that § 3604 must be read narrowly. "If § 804 [§ 3604] was designed to reach every discriminatory act that might conceivably affect the availability of housing, § 805's [§ 3605] specific prohibition of discrimination in the provision of financing would have been superfluous." *Mackey,* 724 F.2d at 423. The Seventh Circuit rejected this argument in *American Family,* holding that §§ 3604 and 3605 overlap and that

> [c]onveying meaning to diverse interpreters for an uncertain future is a difficult business. A wise drafter may state a principle in one section and list some applications of that principle in another, to make pellucid what ought to be apparent but which some judges (and many lay persons) will miss unless spelled out. Using the instance to restrict the principle would gum up the process of communication, inverting every effort to clarify.

*American Family,* 978 F.2d at 298.

We agree with the conclusion in *American Family* that §§ 3604 and 3605 overlap and are not mutually exclusive. We note that many courts have applied § 3604 to a number of parties and practices not mentioned in §§ 3604(b) and 3605. *See United States v. City of Parma,* 661 F.2d 562 (6th Cir.1981) (imposition of building height limitations), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982); *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977) (issuance of zoning permits), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Kennedy Park Homes Ass'n, Inc. v. City of Lackawanna,* 436 F.2d 108 (2d Cir.1970) (rezoning property plaintiff picked for low-income housing project and denying sewer hookups), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). Furthermore, plaintiffs' argument seems confused. Plaintiffs assert that the phrase "otherwise makes

unavailable or denies" is "a catch-all for other activities which, like selling or renting, directly affect the availability of a dwelling. The fact that Congress did not expressly identify each of those other activities does not render § 3604(a) 'vague.'" Plaintiffs' Brief at 15. This argument seems to contradict plaintiffs' argument that by listing proscribed behavior in § 3604(b) and 3605, Congress intended for all other activity affecting the availability of housing to be outside the gambit of the Fair Housing Act. Therefore, we conclude that the principle of "expressio unius est exclusio alterius" does not preclude HUD's interpretation of the Act.

■ Plaintiffs further argue that the legislative history of the Fair Housing Act reflects the Congressional intent that the Fair Housing Act not govern insurance underwriting practices. Relying on *Mackey*, plaintiffs argue that although Congress did not directly address the Act's application to insurance practices, it is implausible that Congress intended the Fair Housing Act to reach insurance practices in light of the fact that (1) Congress enacted the Urban Property Protection and Reinsurance Act of 1968 ("UPPRA"), *see* 12 U.S.C. § 1749bbb, *et seq.*, in the same year it enacted the Fair Housing Act, and (2) subsequent attempts to amend the Fair Housing Act to expressly prohibit discrimination in insurance have failed.

Plaintiffs assert that "[t]he fact that hazard insurance was not mentioned in the [Fair Housing Act] or its legislative history strongly indicates that [Congress did not intend to proscribe discrimination in hazard insurance]." *Mackey*, 724 F.2d at 423. Plaintiffs note that Congress enacted UPPRA in 1968, the same year the Fair Housing Act was enacted, to handle the problem of the unavailability of hazard insurance in some urban areas. However, in *Dunn v. Midwestern Indem. Mid–American Fire & Casualty Co.*, 472 F.Supp. 1106, 1111 (S.D.Ohio 1979), the court found that the purposes of the Fair Housing Act and UPPRA were different. The court noted that UPPRA "was enacted to protect private insurance companies from the risk of catastrophic losses which resulted from riots or civil disorders[,]" but did not "expressly address the issue of discriminatory insurance redlining based on race." *Dunn*, 472 F.Supp. at 1111. We agree that the purposes of the two acts are different and that the enactment of UPPRA does not shed light on Congress' intent regarding the application of the Fair Housing Act to insurance underwriting practices. In *American Family*, the Seventh Circuit noted:

Silence in the legislative history could imply that Members of Congress did not anticipate that the law would apply to insurers. Silence equally could imply that the debate was about the principle of non-discrimination, leaving details to the future. The backwards phraseology of § 3604 suggests the latter possibility.

*American Family*, 978 F.2d at 299. Therefore, we conclude that the legislative history of the Fair Housing Act does not preclude HUD's interpretation of the Act.

■ Next, plaintiffs argue that the failure of subsequent attempts by Congress to amend the Fair Housing Act to expressly prohibit discrimination in insurance supports their contention that Congress did not intend for the Act to govern insurance underwriting practices. Plaintiffs stress that attempts to amend the Act failed after the Fourth Circuit's decision in *Mackey*, which squarely rejected the proposition that §§ 3604(a) or (b) implicitly encompassed the regulation of insurance. However, in *American Family*, the Seventh Circuit held that *Mackey's* conclusion that unsuccessful attempts to amend the Fair Housing Act to explicitly address discriminatory insurance practices reflected Congress' disapproval of this reading was unwarranted. *American Family*, 978 F.2d at 299. The Seventh Circuit explained:

Proposed legislation can fail for many reasons. Some Members of Congress may oppose the proposal on the merits; others may think it unnecessary and therefore not worth the political capital needed to write the "clarification" into the statute over opposition; still others may be indifferent, or seek to use the bill as a vehicle for some unrelated change. Congress may run out of time, as a noncontroversial bill sits in a queue while a contentious proposal is debated. No surprise, therefore, that the Supreme Court repeatedly reminds us that

unsuccessful proposals to amend a law, in the years following its passage, carry no significance.

*Id. See also McDiarmid v. Economy Fire & Casualty Co.,* 604 F.Supp. 105, 107–08 (S.D.Ohio 1984); *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990).

Thus, we conclude that subsequent failed attempts to amend the Fair Housing Act are not helpful in determining the intent of the Congress that enacted the Act. Furthermore, Congress gave HUD the authority to promulgate regulations knowing that HUD had consistently interpreted the Act as governing insurance underwriting practices. *American Family,* 978 F.2d at 300. Therefore, we conclude that plaintiffs have failed to show any evidence of Congressional intent to preclude the application of the Fair Housing Act to insurance underwriting practices.

■ We next turn to the second question under a *Chevron* analysis—whether the agency's interpretation of the Fair Housing Act is reasonable.[2] Under *Chevron,* "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. "However, this deference does have its limits. Courts may invalidate agency adjudication or rulemaking which is 'inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement.'" *Lansing Dairy,* 39 F.3d at 1350 (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). "Similarly," where the court determines that, given the intention of Congress to achieve

some goal, ' "there are compelling reasons that [the agency interpretation] is wrong," ' "the court may invalidate the agency's action." *Id.* (quoting *Boettger v. Bowen,* 923 F.2d 1183, 1186 (6th Cir.1991) (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)).

In *American Family,* the court found that "Section 3604 is sufficiently pliable that its text can bear the Secretary's construction [interpreting § 3604 as prohibiting insurance redlining]." *American Family,* 978 F.2d at 300. We agree. The purpose of the Fair Housing Act as a whole is "to eliminate the discriminatory business practices which might prevent a person economically able to do so from purchasing a house regardless of his race." *Dunn,* 472 F.Supp. at 1109. Moreover, "[t]he language of the Act is broad and inclusive." *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *See Babin,* 18 F.3d at 344 ("Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class."). Thus, we conclude that HUD's interpretation of the Fair Housing Act is reasonable in light of the direct connection of availability of property insurance and ability to purchase a house. *See Dunn,* 472 F.Supp. at 1109; *American Family,* 978 F.2d at 298, 300–01.

Plaintiffs argue, however, that the "[d]enial of property insurance, even if discriminatory, is simply not akin to denying or making unavailable a dwelling." Plaintiffs' Brief at 13. Therefore, plaintiffs argue that the provision of insurance is too attenuated to the availability of housing for insurance providers to be governed by the Fair Housing Act.

---

2. Plaintiffs argue that *Chevron* is irrelevant to a dispute involving a pure question of statutory construction. Plaintiffs rely on *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) and *NLRB v. United Food and Commercial Workers Union, Local 23,* 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987). However, plaintiffs' reliance on these cases is misplaced. These cases explain that "on a pure question of statutory construction" a court should not defer to an agency's interpretation of a statute if " 'using traditional tools of statutory construction' " a court can determine congres-

sional intent. *NLRB,* 484 U.S. at 123, 108 S.Ct. at 421 (quoting *Cardoza–Fonseca,* 480 U.S. at 446–48, 107 S.Ct. at 1221–22). However, if the statute is ambiguous, then " 'the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " *NLRB,* 484 U.S. at 123, 108 S.Ct. at 421 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782). Therefore, because we conclude that the Fair Housing Act is ambiguous regarding its application to insurance underwriting practices, we only determine whether HUD's interpretation of the Act is permissible.

Plaintiffs rely on *Babin,* in which we addressed the question of the extent to which "the phrase 'otherwise make unavailable' reaches out to make unlawful actions that are removed from the central event of purchasing or leasing a dwelling but nonetheless have some effect on a person's ability to acquire housing" in interpreting a similar provision of the Fair Housing Act that prohibits discrimination on the basis of a person's handicap. *Babin,* 18 F.3d at 344. In *Babin,* the plaintiffs alleged that neighbors who bought a house to prevent its use as a group home for mentally handicapped adults violated the Fair Housing Act by making housing "unavailable" to a protected class of people. In holding that the Fair Housing Act could not be read so broadly so as to encompass "normal economic competition," we refused to interpret the Act to prohibit "any action that results in the unavailability of housing for protected classes." *Babin,* 18 F.3d at 344–45. However, in *Babin,* we also acknowledged that the phrase "otherwise make unavailable" might extend to "other actors who, though not owners or agents, are in a position directly to deny a member of a protected group housing rights." *Id.* at 344.

*Babin* is distinguishable from the present case. Unlike *Babin,* the availability of property insurance has a direct and immediate affect on a person's ability to obtain housing. *See American Family,* 978 F.2d at 298, 300–01; *Dunn,* 472 F.Supp. at 1109. Accordingly, we conclude that HUD's interpretation of the Fair Housing Act is consistent with goals of the Fair Housing Act and a reasonable interpretation of the statute.

▪ Plaintiffs argue that the district court erred in applying *Chevron* to this case. Specifically, plaintiffs assert that *Chevron* is limited to agency regulations that address technical determinations requiring agency expertise. In support of this contention, plaintiffs rely on *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). However, the regulation at issue in *Bowen* was promulgated under the authority of a general delegation of power to any agency head, "regardless of his agency's mission or expertise" to issue regulations to implement the Rehabilitation Act.

*Bowen,* 476 U.S. at 642, 106 S.Ct. at 2120. Under these circumstances, the Court found that there was "not the same basis for deference predicated on expertise as we found [in *Chevron* ] ..." *Id.* at 642 n. 30, 106 S.Ct. at 2120 n. 30. In this case, however, we are faced with the reasonableness of HUD's interpretation of the Fair Housing Act, which it administers. We agree with the district court's holding that *Chevron* provides no indication that its holding is to be limited to its facts. *See Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2793 (holding that it is "entirely appropriate" for an agency to "resolv[e] the competing interests which Congress itself either inadvertently did not resolve or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities"). Thus, we conclude that *Chevron* analysis was appropriate in this case and that the district court did not err in finding that insurance underwriting practices are governed by the Fair Housing Act.

### B.

▪ Plaintiffs argue that district court erred in finding that the McCarran–Ferguson Act does not preempt the regulation of insurance underwriting practices under the Fair Housing Act. The McCarran–Ferguson Act, 15 U.S.C. § 1012(b), provides in relevant part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance[.]

The primary purpose of the McCarran–Ferguson Act was to ensure to the states the continued ability to regulate and to tax the business of insurance. *McDiarmid,* 604 F.Supp. at 108. In *American Family,* the Seventh Circuit explained that "[t]he McCarran–Ferguson Act establishes a form of inverse preemption, letting state law prevail over general federal rules—those that do not 'specifically relate[ ] to the business of insurance." *American Family,* 978 F.2d at 295. Thus, because the Fair Housing Act does not mention insurance, it is covered by the

McCarran–Ferguson Act and cannot be construed in such a way as to invalidate, impair, or supersede any state law enacted to regulate the business of insurance.

Plaintiffs argue that HUD's interpretation of the Fair Housing Act conflicts with Ohio insurance law. Specifically, plaintiffs assert that Ohio law prohibits insurers from "[m]aking or permitting any unfair discrimination between individuals of the same class" involving "essentially the same hazard in the amount of premium, policy fees, or rates charged." Ohio Rev.Code, § 3901.21(M). Thus, plaintiffs argue that "insurers may not charge different rates for risks of the same hazard or charge the same rate for risks of different hazards." Plaintiffs' Brief at 30. Plaintiffs assert that "the threat of disparate impact suits under the Act, *which require no proof of discriminatory intent,* [together with the availability of federal jury trials] impairs neutral risk discernment in violation of the 'fair discrimination' principle." Plaintiffs' Brief at 31 (emphasis in original).

Plaintiffs also argue that HUD's interpretation of the Fair Housing Act impairs the Ohio FAIR Plan, which was enacted, pursuant to UPPRA, to make property insurance available to individuals unable to obtain insurance in the private market because of the location of their property. Plaintiffs argue that if HUD applies a disparate impact approach to the Fair Housing Act, then this application would impair or supersede the Plan's allocation of the risk of loss due to environmental hazards and would interfere with the private insurance market which the Plan intentionally left alone. In their reply brief, plaintiffs concede that they do not argue that the FAIR Plan authorizes discrimination on the basis of race or any other impermissible factor. Plaintiffs' Reply Brief at 14. Thus, plaintiffs' argument hinges on HUD's hypothetical application of a disparate impact approach to insurers.

Defendant HUD responds that plaintiffs may not challenge the validity of the HUD's regulation interpreting the Fair Housing Act on the ground that HUD might apply some form of disparate impact analysis to them in the future. In other words, HUD argues that because it has never applied a disparate impact approach to insurance providers, this issue is not ripe for review. We note that in his report and recommendation, the magistrate judge concluded that plaintiffs' action was ripe and that HUD did not object to the magistrate judge's report and recommendation. Generally, the failure to object to a magistrate's report and recommendation precludes appellate review of an issue. *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). However, we have held that "this general rule is subject to the familiar exception that parties can neither waive objections nor consent to subject matter jurisdiction." *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1325 (6th Cir.1993). We review a district court's finding of subject matter jurisdiction de novo. *Greater Detroit Resource Recovery Authority v. United States EPA,* 916 F.2d 317, 319 (6th Cir.1990). Furthermore, we have held that " 'every federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review".' " *Id.* (quoting *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (quoting *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)); *see Bigelow v. Michigan Dep't of Natural Resources,* 970 F.2d 154, 157 (6th Cir.1992) (" 'Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed. This deficiency may be raised sua sponte if not raised by the parties.' ") (quoting *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 502 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991) (citation omitted)). Therefore, we will sua sponte consider for jurisdictional purposes HUD's claim that the application of its regulation under a disparate impact approach was not ripe for review.

The Supreme Court has outlined the ripeness doctrine in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and two companion cases, *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) and

*Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). In those cases, the Court explained as follows:

The injunctive and declarative judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515. The Court also explained that the ripeness requirement involves a two-part test: "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. "In order to be ripe for review, a dispute must satisfy both prongs of the ripeness test." *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision,* 927 F.2d 1332, 1336 (6th Cir.1991).

Thus, we must first determine whether HUD's application of its regulation under a disparate impact analysis is fit for judicial decision. The Supreme Court set forth several factors to consider when analyzing whether issues are appropriate for judicial resolution in *Abbott Laboratories.* In this regard, the Court considered whether the regulations at issue constituted "final agency action." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1516. The Court explained that the "cases dealing with judicial review of administrative actions have interpreted the 'finality' requirement in a pragmatic way." *Id.* Furthermore, we have explained:

As a general rule, final agency action includes "interpretive decisions that crystalize or modify private legal rights." *Feder-*

*al Trade Commission v. Standard Oil of California,* 449 U.S. 232, 247, 101 S.Ct. 488, 497, 66 L.Ed.2d 416 (1980) (Stevens, J., concurring). The D.C. Circuit has explained the purpose of the finality requirement as being to determine "if the agency's position is merely tentative or, on the other hand, whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Ciba–Geigy Corp. v. U.S. Environmental Protection Agency,* 801 F.2d 430, 436 (D.C.Cir.1986). While an agency may generally express tentative views without judicial review, "[o]nce the agency publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of proposed judicial review." *Ibid.*

*Franklin Federal,* 927 F.2d at 1337.

■ In this case, the district court concluded that plaintiffs' action for declaratory and injunctive relief was ripe because HUD's regulation was a final agency action. However, the district court did not distinguish between plaintiffs' challenge to HUD's regulation under a disparate treatment approach, which requires a showing of intentional discrimination, and plaintiffs' challenge under a disparate impact approach, which requires no showing of discriminatory intent. In this case, plaintiffs seek to challenge HUD's regulation by arguing that *if* HUD were to apply a disparate impact analysis under the Act, then insurers could not rely only on neutral environmental risk considerations in their underwriting practices. HUD has never applied a disparate impact analysis to insurers. Plaintiffs rely on the possibility that HUD might so apply its regulation in the future. We note that "[m]ere contemplation of a course of action does not constitute a final agency action." *First Federal Sav. Bank and Trust v. Ryan,* 927 F.2d 1345, 1354 (6th Cir.), *cert. denied,* 502 U.S. 864, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991). Moreover, we note that plaintiffs argue that in the event that HUD applies a disparate impact analysis to insurers, the Act will forbid consideration of neutral underwriting criteria where those

criteria have a discriminatory effect. On the other hand, HUD argues that any application of the disparate impact analysis would depend on the practices alleged to violate the Act and the business necessity put forth to justify them. Thus, we conclude that the issue of HUD's application of a disparate impact analysis to insurers to show a violation of the Fair Housing Act is not sufficiently final.

Furthermore, we do not find that withholding judicial review would constitute an undue hardship upon the parties. In *Toilet Goods,* the Supreme Court addressed a regulation that provided that the Commissioner of Food and Drugs could suspend certification of any manufacturer upon finding that the manufacturer had refused to permit inspectors adequate access to manufacturing facilities. *Toilet Goods,* 387 U.S. at 161, 87 S.Ct. at 1523. The Court concluded that the regulation was not ripe for review, noting:

> The regulation serves notice only that the Commissioner *may* under certain circumstances order inspection of certain facilities and data, and that further certification of additives *may* be refused to those who decline to permit a duly authorized inspection until they have complied in that regard. At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order.

*Toilet Goods,* 387 U.S. at 163, 87 S.Ct. at 1524 (emphasis in original). Similarly, in this case, it is not clear that HUD will apply a disparate impact analysis to its regulation governing insurance providers in the future, and it is not clear what considerations would violate this analysis. Thus, even though plaintiffs might feel uneasy about potential applications of the regulation, they are not under any present legal obligation to base their insurance underwriting practices on factors other than neutral risk considerations. *See First Federal,* 927 F.2d at 1354–55. Accordingly, we conclude that plaintiffs' challenge to HUD's regulation as applied under a disparate impact approach is not ripe for review. Thus, plaintiffs may only challenge HUD's regulation under a disparate treatment approach.

Next, plaintiffs argue that "the availability of private civil actions under the Fair Housing Act, with access to jury trials and unlimited punitive damages, will 'impair or supersede' Ohio insurance law which does not afford such remedies." Plaintiffs' Brief at 33. Plaintiffs assert that the availability of private civil remedies under the Fair Housing Act would allow a claimant to bypass the administrative procedures outlined in the Ohio Insurance Code. In *American Family,* the Seventh Circuit held that the existence of additional remedies does not cause HUD's interpretation of the Fair Housing Act to violate the McCarran–Ferguson Act.

> In the main, federal regulation of a subject—even thoroughgoing federal regulation—does not prevent states from adding remedies to the arsenal established by federal law. The McCarran–Ferguson Act is a form of inverse preemption, so principles defining when state remedies conflict (and so are preempted by) federal law are pertinent in deciding when federal rules "invalidate, impair, or supersede" state rules.

*American Family,* 978 F.2d at 296; *see Merchants Home Delivery Svc., Inc. v. Frank B. Hall & Co.,* 50 F.3d 1486, 1491–92 (9th Cir. 1995) (following *American Family* and holding that federal regulation that provides additional remedies to those provided under state insurance plan does not violate McCarran–Ferguson Act). Moreover, in *Mackey,* the Fourth Circuit held that "[t]he presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act ..." *Mackey,* 724 F.2d at 421. Therefore, we conclude that the presence of additional remedies in the Fair Housing Act does not cause the Act to invalidate, impair or supersede Ohio insurance law. Accordingly, we hold that the McCarran–Ferguson Act does not preclude HUD's interpretation of the Fair Housing Act.

### C.

Finally, plaintiffs argue that the district court erred in dismissing plaintiffs' state law claims against the Dayton defendants. We have held that " 'generally, "if the federal

claims are dismissed before trial ... the state claims should be dismissed as well." ' " *Landefeld v. Marion General Hospital, Inc.,* 994 F.2d 1178, 1182 (6th Cir.1993) (quoting *Taylor v. First of America Bank–Wayne,* 973 F.2d 1284, 1287 (6th Cir.1992) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). "A district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues. . . . This court will review only for an abuse of discretion by the district court." *Landefeld,* 994 F.2d at 1182.

 In this case, the magistrate judge recommended that the district court should not exercise pendent jurisdiction over the remaining state law claims because plaintiffs' claim involves a novel issue of state law. Plaintiffs assert that the Dayton Revised Code of General Ordinances conflicts with Ohio insurance and civil rights law. In addition, plaintiffs challenge the validity of a Dayton ordinance forbidding insurance redlining. We agree with the magistrate judge that "a state court is better able to determine whether state law conflicts with and supersedes an allegedly conflicting ordinance passed by and being enforced by one of the municipalities within its jurisdiction." J.A. 175. Accordingly, we hold that the district court did not abuse its discretion in dismissing plaintiffs' state law claims.

### III.

For the reasons stated, the judgment of the district court is AFFIRMED.

KENNEDY, Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion because I believe that Congress did not intend for the Fair Housing Act to reach the activities of the insurance industry. As the Fourth Circuit wrote in *Mackey v. Nationwide Insurance Companies,* 724 F.2d 419, 423 (4th Cir.1984), "[i]f [§ 3604] was designed to reach every discriminatory act that might conceivably affect the availability of housing, [§ 3605's] specific prohibition of discrimination in the provision of financing would have been superfluous." Under the

majority's reasoning, discrimination in financing clearly would violate section 3604.

Furthermore, repeated attempts to amend the Fair Housing Act to expressly include insurance practices have failed, although the Act has been amended to prohibit other discriminatory activities. *See id.* at 424; 42 U.S.C. § 3605. (e.g., adding discrimination by appraisers.) Additionally, the legislative history is devoid of references to the insurance industry. *Mackey,* 724 F.2d at 424. I do not believe that Congress would have intended to include insurance practices without at least considering the limitations imposed by the McCarran–Ferguson Act. Finally, I disagree with the majority that *Chevron* applies to this case. Where this Court can ascertain Congressional intent through traditional tools of statutory construction, deference to the agency's interpretation is unnecessary. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 445–48, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987).